Nos. 21-2345 and 22-1039 (consolidated)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

SSI TECHNOLOGIES, LLC,

*Plaintiff-Appellant*,

v.

DONGGUAN ZHENGYANG ELECTRONIC MECHANICAL, LTD.,

*Defendant-Cross-Appellant*.

On appeal from the United States District Court for the Western District of Wisconsin, Case No. 3:20-cv-00019-jdp, Honorable James D. Peterson, Presiding

## DONGGUAN ZHENGYANG ELECTRONIC MECHANICAL, LTD.'S
## NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF

Joseph M. Kuo (joseph.kuo@saul.com)
Elizabeth A. Thompson (elizabeth.thompson@saul.com)
Saul Ewing Arnstein & Lehr LLP
161 North Clark Street, Suite 4200
Chicago, Illinois 60601
(312) 876-7100
*Attorneys for Defendant-Cross-Appellant*
*Dongguan Zhengyang Electronic Mechanical, Ltd.*

## CLAIM 1 OF U.S. PATENT NO. 8,733,153

1. A system for determining a quality of a fluid in a tank, the system comprising:

a transducer configured to generate a sound wave and to detect an echo of the sound wave, the transducer positioned near the bottom of the tank such that the sound wave travels toward a fixed object, the fixed object positioned a known distance away from the transducer;

a temperature sensor configured to detect a temperature of the fluid; and

a controller configured to

 produce a signal to drive the transducer to produce the sound wave,

 receive an indication of the detected echo from the transducer,

 receive an indication of the temperature of the fluid from the temperature sensor, and

 determine whether a contaminant exists in the fluid based on the temperature of the fluid, a time period from when the sound wave is produced to when the echo is detected and at least one of the group of a) whether a measured volume is out of range and b) a dilution of the fluid is detected while the measured volume of the fluid decreases.

## CLAIM 9 OF U.S. PATENT NO. 9,535,038

9. A sensor operable to sense a characteristic of a fluid, the sensor comprising:

a sensing area configured to contain the fluid;

a chimney configured to exhaust entrapped air from the sensing area; and

a filter covering the sensing area, the filter configured to allow a liquid portion of the fluid to enter the sensing area, and

substantially prohibit one or more gas bubbles of the fluid from entering the sensing area; and

a transducer configured to

output a pulse of sound through the liquid portion of the fluid contained within the sensing area,

receive the reflected pulse of sound, and

output a characteristic of the fluid based on the received pulse of sound.

## CERTIFICATE OF INTEREST

Counsel for Defendant-Cross-Appellant certifies the following:

1.     I represent Dongguan Zhengyang Electronic Mechanical Ltd. ("DZEM").

2.     DZEM is the real party in interest and has no parent corporations and no publicly held companies own more than 10% of its stock.

3.     The names of all law firms, partners and associates that appeared before the Western District of Wisconsin, or who are expected to appear here are:

- Shane A. Brunner, Michael Best & Friedrich, LLP

- Michael Bess, Michael Best & Friedrich, LLP

- Joshua Ryan Gray, Michael Best & Friedrich LLP

- Melanie J. Reichenberger, Michael Best & Friedrich LLP

- Kenneth M. Albridge, Michael Best & Friedrich LLP

- Joseph M. Kuo, Saul Ewing Arnstein & Lehr LLP

- Courtland C. Merrill, Saul Ewing Arnstein & Lehr LLP

- Michael J. Pollock, Saul Ewing Arnstein & Lehr LLP

- Elizabeth A. Thompson, Saul Ewing Arnstein & Lehr LLP

4.     There are no other cases known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this Court's decision in the pending appeal.

1

Date: February 7, 2022                         Respectfully Submitted,

                                               /s/ Joseph M. Kuo
                                               Joseph M. Kuo
                                               Saul Ewing Arnstein & Lehr LLP
                                               161 North Clark Street, Suite 4200
                                               Chicago, Illinois 60601
                                               Tel: (312) 876-7100
                                               Email: joseph.kuo@saul.com

# TABLE OF CONTENTS

**STATEMENT OF RELATED CASES UNDER  FEDERAL CIRCUIT RULE 47.5**........................................................................................................1

**STATEMENT OF THE ISSUES**........................................................................1

**STATEMENT OF THE CASE**...........................................................................2

   I.   Introduction ...........................................................................................2

   II.   The Patents-In-Suit..............................................................................7

   A.  The '153 Patent .................................................................................7

   B.  The '038 Patent ..............................................................................11

   III.   The Accused DZEM Sensor...............................................................14

   IV.   Procedural History..............................................................................18

**SUMMARY OF THE ARGUMENT** .................................................................18

**STANDARD OF REVIEW** ..............................................................................20

**ARGUMENT** .....................................................................................................21

   I.   THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NONINFRINGEMENT FOR THE '153 PATENT .................21

   II.   THE DISTRICT COURT PROPERLY FOUND NO TRIABLE ISSUE AS TO WHETHER DZEM INFRINGED THE ASSERTED CLAIMS OF THE '038 PATENT ...................................................................................................30

   A.  The District Court Correctly Construed "Filter"........................30

   B.  The District Court Correctly Found That The DZEM Sensor Does Not Include The Claimed "Filter"....................................................43

   III.   THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO SSI ON DZEM'S TORTIOUS INTERFERENCE COUNTERCLAIM............................................................................................51

   A.  DZEM's Tortious Interference Claim is Not Barred by Noerr-Pennington 52

     1.   SSI's Threatening Letters are Not Protected ...........................53

     2.   Even if the Letters are Protected, the Sham Litigation Exception Applies 55

B.  Questions of Fact Otherwise Precluded Entry of Summary Judgment on DZEM's Tortious Interference Claim..................................................................57

C.  DZEM's Patent Invalidity Claim Should Not Have Been Dismissed as Moot................................................................................................................59

IV.  CONCLUSION ...........................................................................................63

**Confidential Material Redacted**: this Brief contains confidential material on pages 3, 4, 54, and 59. This confidential material consists of customer names subject to a protective order in the District Court.

39621689.1

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354 (Fed. Cir. 2008) ............56

*Advanced Steel Recovery, LLC v. X-Body Equip, Inc.*, 808 F.3d 1313 (Fed. Cir. 2015) ................................................21

*Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361 (Fed. Cir. 2003)..................31, 36

*Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042 (Fed. Cir. 2000) ...........33

*AstraZeneca LP v. Breath Ltd.*, 542 Fed. Appx. 971 (Fed. Cir. 2013)....................21

*Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340 (Fed. Cir. 2007) ..........62

*Bradium Tech. LLC v. Iancu*, 923 F.3d 1032 (Fed. Cir. 2019) ...............................31

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ....................53

*Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993).....................59, 62

*Cent. Telecommunications, Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711 (8th Cir. 1986)................................................57

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343 (Fed. Cir. 2014)............................................52, 56

*Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973 (Fed. Cir. 1999)..........................42

*Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301 (Fed. Cir. 2006) ..............22

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002).......48

*Fin. Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311 (Fed. Cir. 2001).............60

*Flexuspine, Inc. v. Globus Medical, Inc.*, 879 F.3d 1369 (Fed. Cir. 2018).............61

*Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340 (Fed. Cir. 2005).......................60

*Gemalto SA v. HTC Corp.*, 754 F.3d 1364 (Fed. Cir. 2014) ..................................39

39621689.1

*Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367 (Fed. Cir. 2004) ................................................................................55

*Golden Eye Media USA, Inc. v. Trolley Bags UK, Ltd.*, 525 F. Supp. 3d 1145 (2021) ...........................................................................................53, 56

*Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464 (Fed. Cir. 1990) .....34

*Hill-Rom, Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337 (Fed. Cir. 2000)..............62

*Industrial Models, Inc. v. SNF, Inc.*, 716 Fed. Appx. 949 (Fed. Cir. 2017)......54, 55

*Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117 (D. Minn. 2016).......................................................................................53

*Inverness Medical Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373 (Fed. Cir. 2002) ................................................................................42

*Jang v. Boston Scientific Corp.*, 872 F.3d 1275 (Fed. Cir. 2017) ...........................51

*Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361 (Fed. Cir. 2004)..............21

*Markman v. Westview Instr., Inc.*, 517 U.S. 370 (1996) .........................................30

*Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942 (Fed. Cir. 2016).......................22

*Netword, LLC v. Centraal Corp.*, 242 F.3d 1347 (Fed. Cir. 2001) ........................22

*Network Commerce v. Microsoft*, 422 F.3d 1353 (Fed. Cir. 2005) ........................48

*Novartis Corp. v. Ben Venue Labs, Inc.*, 271 F.3d 1043 (Fed. Cir. 2001) ..............20

*On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331 (Fed. Cir. 2006)31, 36

*Ottah v. Fiat Chrysler*, 884 F.3d 1135 (Fed. Cir. 2018).........................................50

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ......................30, 31, 32, 37

*Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367 (Fed. Cir. 2014)................................................................................47

iv

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296 (Fed. Cir. 2011) ..................................................................................38

*Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294 (Fed. Cir. 1999) .....53, 55

*SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372 (Fed. Cir. 2007) .........60

*Shank v. William R. Hague, Inc.*, 192 F.3d 675 (7th Cir. 1999)...............................58

*SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373 (Fed. Cir. 2021)........................49

*Telecordia Technologies, Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365 (Fed. Cir. 2010) 60

*Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14-cv-0206, 2017 WL 1178224 (N.D. Ill. Mar. 30, 2017)........................................................................54

*V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307 (Fed. Cir. 2005) ..........32

*VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422 (W.D. Pa. 1998) ...............56

*VirnetX Inc. v. Apple Inc.*, 931 F.3d 1363 (Fed. Cir. 2019)....................................61

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)..............34, 38

*Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).................28, 29

## STATE CASES

*Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.3d 781 (Wis. 2006) ................................................................................52, 59

*Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203 (Wis. Ct. App. 1995)..........................................................................57

*Rittenhouse v. Hulce*, 827 N.W.2d 929 (Wis. Ct. App. 2013)................................59

## FEDERAL STATUTES

35 U.S.C. § 102 ..............................................................................5, 63

35 U.S.C. § 103 ....................................................................................5

35 U.S.C. § 112 ............................................................................passim

v

## OTHER AUTHORITIES

*American Heritage Dictionary* .................................................................43

*Collins Dictionary* ................................................................................42

*Dictionary of Mechanical Engineering* .................................................42

https://www.collinsdictionary.com/us/dictionary/english/mesh ............................37

https://www.collinsdictionary.com/us/dictionary/english/porous;
   https://www.merriam-webster.com/dictionary/pore ...................................44, 45

U.S. Patent No. 7,118,206 .......................................................................39

U.S. Patent No. 7,270,690 .......................................................................39

U.S. Patent No. 8,733,153 ...................................................................passim

U.S. Patent No. 9,535,038 ...................................................................passim

U.S. Patent No. 10,012,121 .......................................................................3

39621689.1

## STATEMENT OF RELATED CASES UNDER
## FEDERAL CIRCUIT RULE 47.5

In accordance with Federal Circuit Rule 47.5, there are no related cases.

## STATEMENT OF THE ISSUES

1.    Did the District Court err in its claim construction of the term "filter" where the intrinsic evidence and extrinsic evidence fully support the District Court's construction?

2.    Did the District Court err in granting summary judgment in favor of DZEM on Plaintiff-Appellant SSI Technologies, Inc.'s ("SSI") patent infringement claims related to U.S. Patent No. 9,535,038 ("'038 Patent") because the accused products do not meet the "filter" limitation as construed by the District Court?

3.    Did the District Court err in granting summary judgment in favor of DZEM on SSI's patent infringement claims related to U.S. Patent No. 8,733,153 ("'153 Patent") because the accused products do not meet the claimed "controller" limitation?

4.    Did the District Court err in granting summary judgment in favor of SSI on DZEM's tortious interference with contract claims where questions of fact existed regarding the application of the *Noerr-Pennington* doctrine?

5.    Did the District Court err in granting summary judgment in favor of SSI on DZEM's tortious interference with contract claims where DZEM's

39621689.1

prospective clients resided in countries where SSI has no patent protection and where DZEM provided competent testimony sufficient to create a material question of fact as to whether a concrete likelihood of a business advantage existed?

6.    Did the District Court err in dismissing DZEM's invalidity counterclaim where this Court and the United States Supreme Court have expressed a clear preference for resolution of patent claims in their entirety rather than in piecemeal fashion?

## STATEMENT OF THE CASE

This case concerns two patents related to diesel emission mitigation systems, namely, the '153 Patent and the '038 Patent.

## I.    Introduction

This dispute arises from objectively baseless claims of patent infringement brought by SSI against DZEM in hopes of thwarting legitimate competition from DZEM. SSI alleges that claims 1, 2, 4, 7, and 8 of the '153 Patent and claims 9, 10, 11, 12, 13, and 18 of the '038 Patent are infringed by DZEM's sales and offers for sale of a sensor in a diesel emission system ("DZEM Sensor" or "Accused Product").

SSI and DZEM[1] are competitors in automotive sensor products. (ECF No. 126 ¶ 2 (Kirby Aff. (filed under seal) (hereinafter "Kirby Aff."))). DZEM designs its

---

[1] DZEM operates under the brand name KUS.

This page contains confidential material - customer name

DZEM DEF Quality Sensor and markets it to customers in the Original Equipment Manufacturer ("OEM") automotive industry. In late 2018, SSI became aware that it had competition in the OEM marketplace, acknowledging in internal documents that major OEMs were working with DZEM. (ECF No. 127, Ex 3.) Facing the potential of increased competition from DZEM in the United States and Europe, SSI embarked on a coordinated campaign with its management and sales force to threaten DZEM and blanket the industry with allegations of patent infringement of the '038 Patent by DZEM despite having no reasonable basis for doing so.

In October of 2019, SSI sent DZEM a letter alleging that the DZEM Sensor infringed on SSI's '038 Patent (one of the patents-in-suit), as well as U.S. Patent No. 10,012,121 (which SSI subsequently dropped and is not at issue in this litigation). (Kirby Aff. ¶ 3.) DZEM denied that its sensor infringed on any of SSI's patents and asked for an explanation of SSI's position. (*Id.* ¶ 5.) Instead of providing any such explanation, SSI engaged in a letter-writing campaign to DZEM's current and prospective customers.

For example, SSI contacted █████, a trucking company in the Netherlands (hereinafter referred to as the "Dutch Company"), claiming that DZEM's sensor infringed upon SSI's patents. (*Id.* ¶ 8.) At the time SSI sent this letter, DZEM was close to entering into a contract with the Dutch Company. (Appx116.) SSI likewise

3

This page contains confidential material - customer name

contacted [customer name] , stating that it was preparing to sue DZEM and that, as a result, its supply of the DZEM Sensor may be interrupted. (Kirby Aff. ¶ 9.) Indeed, SSI contacted every large OEM company in the relevant market in order to dissuade these companies from doing business with DZEM. (*Id.* ¶ 11.)

In January of 2020, immediately after filing suit in this action, SSI sent additional communications to at least *nineteen* customers in the vehicle manufacturing business. (Appx1611-12.) For example, SSI sent the Dutch Company an email that stated:

> please find attached IP infringement letter. SSI is announcing lawsuit against KUS….
>
> Please be aware, every other company using an aeration filter infringing our patent will be sued.

(ECF No. 127, Ex. 5.) SSI knew that DZEM was doing business with six of these customers and that another seven conduct their business activities in countries where SSI has no patent protection. (ECF No. 127, Ex. 1 (Answers to Requests to Admit ¶¶ 47-58)). As a result of SSI's threats, DZEM was required to meet with each of these customers and explain, in detail, how the DZEM Sensor did not infringe SSI's patents. (Kirby Aff. ¶¶ 13-18.) DZEM has been required to expend money, time, and resources meeting with its clients, on legal fees in continued negotiations, and faced delays in its contracts with its clients. (*Id.* ¶ 19.)

39621689.1

Accordingly, on February 14, 2020, DZEM brought its Counterclaim against SSI. (ECF No. 8; Appx103-28.) Relevant to this appeal,[2] Counts II and V of DZEM's Counterclaim sought a declaration that SSI's patents-in-suit were invalid for failure to comply with 35 U.S.C. §§ 102, 103, and 112. (*Id.*) Count III sought to recover for tortious interference as a result of SSI's inappropriate contact with DZEM's current and prospective clients. (*Id.*)

On April 23, 2021, SSI filed its motion for summary judgment on DZEM's Counterclaim, arguing that DZEM's tortious interference claim was barred by the *Noerr-Pennington* doctrine and that SSI was otherwise entitled to judgment as a matter of law on that claim. (Appx952.) On September 3, 2021, the District Court entered summary judgment in favor of SSI on DZEM's tortious interference claim. That court held:

> SSI's communications with companies in countries where SSI enjoys patent protection were protected under *Noerr-Pennington* because this lawsuit wasn't objectively baseless. And even if SSI's communications with companies in other countries weren't protected by *Noerr-Pennington*, DZEM has failed to adduce evidence that it had prospective contracts with those companies. The court will grant SSI's motion regarding DZEM's tortious-interference counterclaims.

---

[2] Counts I and IV of DZEM's Counterclaim were for noninfringement and the District Court appropriately granted summary judgment in favor of DZEM on those claims. (Appx17.)

(Appx21.) The District Court then dismissed DZEM's patent invalidity claim as moot, finding that DZEM did not risk any future prosecution under either of the patents-in-suit. (Appx18.) After SSI appealed the District Court's judgment of noninfringement, DZEM cross-appealed that court's determinations on its Counterclaim.

SSI's infringement threats to the industry on the '038 patent were made despite the DZEM Sensor obviously lacking at least one critical element of the supposed invention described and claimed in the '038 Patent, including, but not limited to, a filter surrounding a sensing area. The only teaching in the '038 Patent of this "filter" was a porous structure that prevented substantially all bubbles from entering a sensing area by having holes sized to prevent such entrance. The DZEM Sensor, rather than include a filter around a sensing area, utilized a rubber cover with a few large holes that created a tortuous path for fluid flow similar to numerous prior art devices, including prior art known to SSI, and indeed cited by SSI during prosecution of the '038 Patent. Undeterred, SSI sent infringement threats to all of DZEM's potential and existing customers, including customers in jurisdictions for which SSI had no patent protection.

39621689.1

## II.    The Patents-In-Suit[3]

The patents-in-suit relate to a device for sensing a characteristic of a fluid, such as the Diesel Exhaust Fluid (DEF) used in a selective catalytic reduction diesel emission-control system. (Appx59, Col. 1:14-19; Appx78, Col. 1:20-27.) To sense characteristics of the DEF, the patents teach using a piezoelectric transducer to generate an ultrasonic pulse to determine time of flight ("ToF") data for the ultrasonic pulse to travel to a reflector and the echo to return back to the transducer. (Appx59, Col. 1:46-60; Appx79, Col. 3:53-4:4.) The processing of sensor data is controlled through use of a programmed controller, such as a printed circuit board, which determines a fluid characteristic based on fluid temperature data obtained with a temperature sensor and the ToF data. (Appx60, Col. 5:44-47; Appx79, Col. 3:39-52.)

### A.    The '153 Patent

The '153 Patent includes several claims directed to different aspects of a system for sensing characteristics of a fluid in a tank. The '153 Patent specification Summary states, "[t]he invention uses immersed piezoelectric ultrasonic transducers to … determine if the DEF has been contaminated (including determining the type

---

[3] DZEM limits its recitation of the facts of SSI's appeal to those with which it disagrees pursuant to this Court's Rule 28(b).

and amount of contaminant)." (Appx59, Col. 1:36-40.) The specification further states:

> In one embodiment, the invention provides a system including a tank, a controller, a transducer, and a temperature sensor. The temperature sensor senses a temperature of a fluid in the tank. The controller uses the sensed temperature to derive the temperature-dependent speed of sound for an ultrasonic signal traveling through the fluid. The controller generates a first command signal for the transducer. In response, the transducer generates an ultrasonic sound wave toward a fixed surface and receives an echo of the ultrasonic sound wave reflected off the fixed surface. The controller determines an elapsed time between the transmission of the ultrasonic sound wave by the transducer and the reception of the echo by the transducer. The controller also determines a concentration and presence of any contaminants in fluid in the tank based on the elapsed time and the sensed temperature of the fluid.

(Appx59, Col. 1:46-60.)

The scientific theory behind using ultrasound is based on known ultrasound wave velocity values in particular fluids at specific temperatures. Based on the ToF of an ultrasonic pulse for a known distance at a known temperature, a velocity is determinable by the well-known formula distance divided by time, e.g., m/sec. This velocity may then be compared with expected velocities for particular fluids to determine concentration or fluid level. (Appx63, Col. 9:17-10:30; Appx58, Fig. 6.) Shown below is an excerpted portion of Fig. 1 of the '153 Patent where component 115 is the piezoelectric transducer, and dotted line 130 represents the transmission and return of the ultrasonic pulse.

8



(Appx53.) The specification explains the "invention" of the contaminant detection

sensor:

> [The] "invention uses immersed piezoelectric ultrasonic transducers … to determine if the DEF has been contaminated (including determining the type and amount of contaminant)." (Appx59, Col. 1:36-41.)

> "The controller also determines a concentration and presence of any contaminants in fluid in the tank based on the elapsed time and the sensed temperature of the fluid." (Appx59, Col. 1:58-60.)

> "It is possible for contaminants to become introduced into the tank (e.g., when filling the tank). … Introduction of a contaminant into the tank 110 changes the speed of sound within the liquid 105, which is readily detected as either a shift in the UREA concentration level for small deviations, such as diluted UREA, or an out of range measurement for large deviations, such as would be the case with diesel fuel. … The controller 400 can be configured to generate a diagnostic output, or out of range output signal, at output driver 420 whenever the measured speed of sound for a given temperature exceeds or falls below that which has been defined within the UREA concentration look-up table." (Appx63, Col. 9:60-10:26.)

As originally filed, claim 1 recited:

> 1. A system for determining a quality and/or quantity of a fluid in a tank, the system comprising:

> a transducer configured to generate a sound wave and to detect an echo of the sound wave, the transducer positioned near the bottom

9

of the tank such that the sound wave travels toward a fixed object, the fixed object positioned a known distance away from the transducer;

a temperature sensor configured to detect a temperature of the fluid; and

a controller configured to produce a signal to drive the transducer to produce the sound wave, receive an indication of the detected echo from the transducer, receive an indication of the temperature of the fluid from the temperature sensor, and determine whether a contaminant exists in the fluid based on the temperature of the fluid, a time period from when the sound wave is produced to when the echo is detected.

(Appx1075.) The examiner rejected originally-filed claim 1 because U.S. Patent Application Publication 2010/0018309 to Marcovecchio et al. ("Marcovecchio") rendered it obvious. (Appx1085.) In order to overcome Marcovecchio, SSI amended the claim to require that the controller be configured to determine whether a contaminant exists in the fluid "based on" more than just the originally recited factors of fluid temperature and ToF of the sound pulse, and added a required third factor, namely, "at least one of the group of a) whether a measured volume is out of range and b) a dilution of the fluid is detected while the measured volume of the fluid decreases." (Appx1093.) SSI specifically explained it was this third factor that distinguished its claimed invention over Marcovecchio stating that Marcovecchio:

fails to disclose '[a] system for determining a quality of a fluid in a tank … comprising: … a controller configured to … determine whether a contaminant exists in the fluid based on the temperature of the fluid, a time period from when the sound wave is produced to when the echo is detected, <u>and at least one of the group of a) whether a measured volume is out of range and b) a dilution of the fluid is detected while the measured volume of the fluid decreases</u>.' Marcovecchio determines a

10

fluid mixture ratio based <u>only on the temperature of the fluid and the time of flight of the ultrasound beam</u>. (Appx1103-04.)

The PTO allowed the claim based on this argument.

## B.     The '038 Patent

The '038 Patent is also directed to a sensor for determining the quality of DEF,

and particularly is directed to solving problems that bubbles in the DEF cause.

> It has been recently observed that DEF fluid in an SCR system can become aerated (i.e., mixed with air in such a way that bubbles of air are entrained in the fluid). … Generally, accurate fluid measurements require a homogeneous fluid from which to measure the speed of sound. When the fluid is aerated the path of the ultrasonic sound waves are dispersed by the presence of air bubbles. This interference of the sound waves causes a loss in the reflected echo (i.e., no speed of sound measurement) and thus a loss of accurate fluid measurements.

(Appx78, Col. 1:53-2:3.) To solve the bubble problem, "[t]he invention provides …

a sensor system including a filter for preventing gas bubbles from entering the sensor

system. …. The filter blocks, or inhibits, air bubbles from entering a sensing area of

the fluid sensor. … If air bubbles are embedded within the fluid, the bubbles disperse

the ultrasonic signal resulting in the fluid sensor not receiving the echo reflection,

and thus no accurate time of flight measurement." (Appx80, Col. 6:7-9; Appx78,

Col. 1:64-2:5, Col. 2:12-16.)

Notably, SSI cited during prosecution of the '038 Patent a prior art reference

to a published U.S. Patent Application that also disclosed an ultrasonic fluid sensor,

11

and likewise addressed the problem with bubbles in a sensing area. SSI identified in an information disclosure statement submitted to the patent office U.S. Patent Application Publication No. 2011/0228641 ("Niemann"). (Appx1401.) Niemann discloses an ultrasonic sensor operable to sense a fluid characteristic, namely, its level. (Appx286, ¶ 62; Appx321; Appx2096, ¶¶ 0002, 0008.) The Niemann sensor includes a sensing area configured to contain the fluid through which an ultrasonic pulse is transmitted. (Appx286, ¶ 62; Appx322; Appx2096-98, ¶¶ 0002, 0009, 0032.) Niemann further discloses a device covering the sensing area that contained openings through which liquid is passed, and that kept bubbles from entering the sensing area. (Appx286, ¶ 62; Appx324; Appx2096-98, ¶¶ 0009-0010, 0038-0039.) This device covering the sensing area in Niemann, termed a "stillwell," is configured to allow a liquid portion of the fluid to enter the sensing area, and substantially prohibit one or more gas bubbles of the fluid from entering the sensing area. (*Id.*)

In the '038 Patent, only two embodiments for the claimed "filter" are disclosed:



FIG. 9

(Appx72; Appx74; Appx78, Col. 2:55-60.) In each of these embodiments, the "filter" is taught to be particular structure, namely, a "mesh" (reference numerals 255). (Appx79-80, Col. 4:49-5:17, Col. 5:56-64.)

During prosecution, SSI submitted originally-filed independent claim 1:

A sensor operable to sense a characteristic of a fluid, the sensor comprising:

a sensing area configured to contain the fluid;

a filter covering the sensing area, the filter configured to allow a liquid portion of the fluid to enter the sensing area, and substantially prohibit a gas portion of the fluid from entering the sensing area; and

a transducer configured to output a pulse of sound through the liquid portion of the fluid contained within the sensing area, receive the reflected pulse of sound, and output a characteristic of the fluid based on the received pulse of sound.

(Appx1447.) The examiner rejected this claim under 35 U.S.C. § 112 as non-enabled because:

The specification recites that gas bubbles larger than the holes in the filter are prevented from entering the sensing area, but this prevention of gas bubbles still does not enable the phrase 'substantially prohibit a gas portion' as recited. Gas appears to be entrained in the liquid, such that if the liquid can pass through the holes in the filter, then the gas will pass as well because the gas molecules are smaller than the liquid molecules. Additionally, the phrase "substantially prohibit" implies to the examiner that all of the gas is prohibited from entering the sensing area. It is not clear how the filter can prohibit all gas from passing through the filter, while still allowing the liquid to pass through. Again, this would only appear to work where gas bubbles are larger than the holes in the filter, but all other gases within the liquid would pass through the holes.

13

(Appx1385-86.) In response to the examiner's rejection, SSI did not contradict the examiner's statement about the claimed "filter" and how it functioned. (Appx1374-75.) Instead, SSI acquiesced and amended the claims to specify that the filter keeps "gas bubbles" that are larger than the holes in the filter out, as opposed to a "gas portion," and submitted a new claim also directed to keeping "gas bubbles" out of the sensing area rather than a gas portion. (Appx1371-72.) This "new" claim became claim 9, which is at issue here.

## III.   The Accused DZEM Sensor

The DZEM Sensor includes a thermistor to measure the temperature of fluid within a DEF tank. (Appx644, ¶ 52.) The DZEM Sensor also uses an electro-mechanical arrangement of Reed switches[4] to determine fluid level in the tank. (*Id.*) In order to determine the concentration of urea within the DEF solution, the DZEM Sensor utilizes a separate concentration sensing component having an ultrasonic transducer. (*Id.*) This transducer is controlled by a processor, which is programmed. (Appx645, ¶ 54.) The DZEM Sensor is an embedded system, the operation of which is controlled by the programming in its processor. (*Id.*)

To determine urea concentration, the DZEM Sensor processor causes a voltage to be applied to the transducer, and the processor starts a timer. (Appx667,

---

[4] en.wikipedia.org/wiki/Reed_switch

¶ 128; Appx669, ¶ 133; Appx670, ¶ 138.) In response to this voltage, the transducer emits an ultrasonic pulse. (*Id.*) This ultrasonic pulse travels through a sensing area, is reflected off a reflector, and returns through the sensing area to the transducer. The transducer receives the pulse, and generates a voltage. (*Id.*) This voltage is amplified and transmitted to the processor, and the processor stops the timer. (*Id.*) The processor determines the time for the ultrasonic pulse to be transmitted and returned, i.e., the ToF, and takes a measured fluid temperature value, and then determines urea concentration. (Appx670, ¶ 138.)

The DZEM Sensor is also able to determine the presence of a contaminant in the DEF fluid. Like the prior art, the DZEM Sensor determines the presence of a contaminant in the DEF fluid based on the ToF of an ultrasonic pulse emitted through the fluid and a fluid temperature sensed by thermistor. (Appx647, ¶ 62.) The processor for the DZEM Sensor takes these two factors and checks a look-up table to see if the urea concentration is within a desired range. (Appx648-49, ¶ 67.) If it is not, the processor will indicate that a contaminant is present. (*Id.*) No other data inputs, such as a measured volume, are used by the DZEM Sensor to determine the presence of a contaminant. (*Id.*, Appx662, ¶ 111.)

The DZEM Sensor also utilizes a software-based solution to eliminate flawed readings resulting from bubbles entering the sensing area past a rubber cover, as well

as a surface treatment to further mitigate the effect of bubbles on surfaces of the transducer in the sensing area. (Appx662, ¶ 111.) The DZEM Sensor has no computer code designed to cause the processor to consider a measured fluid volume or level in its concentration calculations. (Appx647, ¶ 62; Appx648-49, ¶ 67.) Instead, concentration is calculated based only on the ultrasound velocity (calculated from the ToF) and fluid temperature. (*Id.*) The quantity of fluid is not considered by the DZEM Sensor processor for any determination of any fluid characteristic. (*Id.*) In particular, whether the measured volume is decreasing or dilution is not considered by the DZEM controller as part of its contaminant detection algorithm. (*Id.*)

To address the problem of bubbles in the fluid that may interfere with the ultrasound pulse, the DZEM Sensor employs multiple solutions. First, to prevent dirt or other debris and some bubbles from entering the path of the ultrasonic pulse, the DZEM Sensor uses a rubber cover having several large openings to redirect a fraction of the bubbles away from the sensing area.





This rubber cover was designed to quickly allow the DEF medium into the sensing area to rapidly detect any changes thereto. Because of this design, the rubber cover allows a substantial number of bubbles into the sensing area. (Appx661-62, ¶ 110.) The number of bubbles entering the sensing area are in an amount that would detrimentally affect the ultrasonic pulse. (Appx661-62, ¶ 111.) As such, the DZEM Sensor utilizes a software-based solution to eliminate bad readings resulting from bubble interference, as well as a surface treatment on the transducer to reduce bubbles adhering to the transducer plate. (*Id.*) These additional solutions are necessary due to the rubber cover not being designed to prohibit bubbles that would

interfere with the ultrasonic pulse from entering the sensing area.

## IV.   Procedural History

Each of the parties filed motions for claim construction and for summary judgment. On September 3, 2021, the District Court found DZEM's claim construction for "filter" in the '038 Patent to be correct and that the DZEM Sensor lacked the claimed filter. (Appx1-22.) The District Court granted DZEM's motion for summary judgment of noninfringement of the '038 Patent. (Appx22.) The District Court further held the asserted '153 Patent claims plainly require a controller that determined whether a contaminant exists in a fluid "based on" fluid temperature, a time of flight for a sound wave, and "at least one of the group of a) whether a measured volume is out of range and b) a dilution of the fluid is detected while the measured volume of the fluid decreases." SSI conceded that the DZEM Sensor did not determine contaminant presence based on "a," and SSI had no evidence as to "b." Thus, the District Court granted DZEM's motion for summary judgment of noninfringement of the '153 Patent. (Appx22.)

The court also granted SSI summary judgment on DZEM's tortious interference claim, and dismissed DZEM's invalidity counterclaims as moot.

SSI filed this appeal, and DZEM filed a cross appeal.

## SUMMARY OF THE ARGUMENT

The District Court correctly determined that none of the asserted claims were

18

infringed by DZEM. The District Court incorrectly determined that there were no triable issues of fact related to DZEM's tortious interference claim. The District Court improperly dismissed DZEM's counterclaims of patent invalidity as moot.

With respect to the '153 Patent, the District Court was correct to grant summary judgment that DZEM did not infringe any of the asserted claims. First, the District Court correctly recognized that the asserted claims required a controller that determined the presence of fluid contaminants based on, inter alia, "a) whether a measured volume is out of range and b) a dilution of the fluid is detected while the measured volume of the fluid decreases." Second, the District Court correctly determined that the DZEM Sensor lacked the claimed controller literally or under the doctrine of equivalents.

With respect to the '038 Patent, the District Court was correct to grant summary judgment that DZEM did not infringe any of the asserted claims. First, the District Court correctly construed the claimed "filter" as "a porous structure defining openings, and configured to remove impurities larger than said openings from a liquid or gas passing through the structure." Second, the District Court correctly determined that the DZEM Sensor lacked the claimed filter literally or under the doctrine of equivalents.

39621689.1

With respect to DZEM's tortious interference claim, the District Court incorrectly determined that there were no triable issues of fact where DZEM's prospective clients resided in countries where SSI has no patent protection and where DZEM provided competent testimony sufficient to create a material question of fact as to whether a concrete likelihood of a business advantage existed.

The District Court improperly dismissed DZEM's counterclaims of patent invalidity as moot where this Court and the United States Supreme Court have expressed a clear preference for resolution of patent claims in their entirety rather than in piecemeal fashion.

## STANDARD OF REVIEW

DZEM agrees with the standard of review stated in SSI's brief. SSI, however, omits that, "[s]ince the ultimate burden of proving infringement rests with the patentee, an accused infringer seeking summary judgment of noninfringement may meet its initial responsibility either by providing evidence that would preclude a finding of infringement, or by showing that the evidence on file fails to establish a material issue of fact essential to the patentee's case." *Novartis Corp. v. Ben Venue Labs, Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001). After the accused infringer makes this showing, "the burden shifts to the nonmovant to designate specific facts showing that there is a genuine issue for trial." *Id*. "Summary judgment of noninfringement

is proper when no reasonable jury could find that every limitation in a properly construed claim is found in the accused device either literally or under the doctrine of equivalents." *Advanced Steel Recovery, LLC v. X-Body Equip, Inc*., 808 F.3d 1313, 1317 (Fed. Cir. 2015).

This Court reviews the District Court's decision to dismiss DZEM's patent invalidity claims as moot for an abuse of discretion. *Liquid Dynamics Corp. v. Vaughan Co.*, 355 F.3d 1361, 1371 (Fed. Cir. 2004); *see also AstraZeneca LP v. Breath Ltd.*, 542 Fed. Appx. 971, 981-82 (Fed. Cir. 2013).

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NONINFRINGEMENT FOR THE '153 PATENT

The District Court properly granted DZEM summary judgment of noninfringement of the '153 Patent because SSI lacked any evidence that the DZEM Sensor included the claimed "controller." SSI failed to present any evidence that the DZEM Sensor included a controller configured to perform the very claim limitation that SSI added to its claims to overcome the prior art. As such, SSI could not sustain its burden of proof of establishing the DZEM Sensor met every claimed limitation, and summary judgment of noninfringement was proper.

Summary judgment of noninfringement requires "a two-part inquiry: first, a court construes the scope and meaning of the asserted patent claims, and then

compares the construed claims to the accused product or process." *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016). "To support a summary judgment of noninfringement it must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee." *Netword, LLC v. Centraal Corp.*, 242 F.3d 1347, 1353 (Fed. Cir. 2001). Because the patentee bears the burden of proving infringement, an accused infringer may carry its initial burden in moving for summary judgment by "stating that the patentee ha[s] no evidence of infringement and pointing to the specific ways in which accused systems did not meet the claim limitations." *Exigent Tech., Inc. v. Atrana Sols., Inc.*, 442 F.3d 1301, 1308-09 (Fed. Cir. 2006).

The '153 patent describes and claims a sensor system that measures the speed at which a sound wave travels through a fluid to determine a quality of the fluid, such as whether the fluid is contaminated. The claimed sensor system is submerged within a fluid tank, and includes a controller, one or more transducers (which the parties agree is "a device that converts an electrical signal into sound and converts sound into an electrical signal" (ECF No. 72, at 2)), and a temperature sensor. A schematic representation is shown in Fig. 1 of the '153 Patent.

22



(Appx53.) To determine whether a contaminant is present in the fluid, the claims require a transducer (115) that transmits a sound wave (130) through the fluid toward a fixed surface (135). The sound wave reflects off the fixed surface and back toward the transducer. The transducer generates a voltage, which is used to calculate the elapsed travel time of the sound waves to the fixed surface and back to the transducer, i.e., "time of flight" or "ToF." Because fluid temperature affects the speed at which sound travels through it, the claimed sensor system also includes a temperature sensor (125). The claim controller is "configured," i.e., programmed, to determine whether there is a contaminant in the fluid. In particular, the claims specify how the controller makes that determination:

> based on the temperature of the fluid, a time period from when the sound wave is produced to when the echo is detected, and at least one of the group of a) whether a measured volume is out of range and b) a dilution of the fluid is detected while the measured volume of the fluid decreases.

39621689.1

(Appx65, Col. 13:28–34.)

The District Court acknowledged that "[t]he parties agree that the DZEM controller is not configured to consider whether a measured volume is out of range, and that the DZEM sensor does not measure the volume of fluid at all." (Appx7.) As such, the question of infringement boiled down to whether SSI had evidence that the DZEM Sensor determined the presence of a fluid contaminant "based on … a dilution of the fluid [being] detected while the measured volume of the fluid decreases." On this point, SSI argues here, as it did to the District Court, that this language requires only that the controller make the contamination determination **while** the measured volume of the fluid is decreasing. According to SSI, because the DZEM Sensor is able to determine the presence of contaminants when the system is running, it makes the contamination determination while the volume of the fluid is decreasing, and therefore meets the claimed limitation.

SSI's infringement position ignores the words of the claim. Put simply, the specific words of the claim require that the controller is configured to make the contamination determination **based on** three inputs: (1) time of flight, i.e., ToF; (2) temperature; and (3) at least one of two factors related to "measured volume," namely, "a) whether a **measured volume** is out of range"; and "b) a dilution of the fluid is detected while the **measured volume** of the fluid decreases." As discussed,

24

SSI added input #3 to the claim to overcome a prior art rejection. As is plain, the claim does not state that contaminant detection is determined merely "while" the system and engine are on. Instead, the claim states that the controller must determine whether a contaminant is present **"based on"** all three factors. "While" and "based on" are two distinct concepts. "While" only suggests a temporal relationship, i.e., things happening at the same time. By contrast "based on" connotes a dependent relationship.

This conceptual distinction between "based on" and "while" is readily illustrated in the following examples. A car's GPS may determine the car's location at the same time its radio is playing, but this does not mean that the location determination is "based on" the radio playing. Similarly, that a car's speedometer may sense its speed, while at the same time the car's fuel sensor senses its fuel level is decreasing, does not mean that the speedometer's reading is based on the car's fuel gauge sensing its fuel level is decreasing. SSI's infringement position improperly attempts to erase the express claim words "based on" and "measured volume" from the claim.

The prosecution history firmly establishes that the controller being configured to determine the presence of contaminants based on all three of the aforementioned factors was essential to the allowance of the claim. Original claim 1 required the

25

controller to determine whether a contaminant was present in the fluid based only on the first two factors: "[1] the temperature of the fluid and [2] a time period from when the sound wave is produced to when the echo is detected." (Appx1075.) As originally presented, the claim did not include any requirement about measured volume. The examiner rejected original claim 1 as obvious based on U.S. Patent Application Publication No. 2010/0018309 by Marcovecchio, which disclosed a sonic fluid sensor that determined fluid composition based on temperature and the time of flight of a sonic pulse sent through the liquid. (Appx1085.) In response, SSI amended the claims and added the limitation related to the measured volume of the fluid, namely, that the controller's contaminant detection is "based on … at least one of the group of a) whether a measured volume is out of range and b) a dilution of the fluid is detected while the measured volume of the fluid decreases." (Appx1093.)

It is undisputed that the DZEM Sensor does not base whether there is a contaminant in the fluid on any consideration of the measured volume of the fluid. Indeed, Plaintiff's purported expert, Van Der Weide, concluded only that "the DZEM Sensor determines a dilution (i.e., contaminant) **while** the system and engine are on. When the system and engine are on, the measured volume of the DEF is decreasing because it is being [sic] the DEF is being consumed to breakdown NOx emissions." (Appx208, ¶ 57.) Even assuming this opinion is correct, it cannot establish any

infringement, because it fails to demonstrate the presence of the claim limitation requiring that the detection of a contaminant is **"based on"** whether dilution is detected while the volume decreases.

SSI disingenuously argues that the District Court erred in its statement that the "DZEM sensor does not measure the volume of fluid at all." SSI then presents evidence that the DZEM Sensor can sense fluid volume. The context of the District Court's statement is readily apparent – it was undisputed that the DZEM Sensor did not measure fluid volume at all as part of its contaminant detection. (Appx7.) Rather than identify any evidence of record that the DZEM Sensor's contaminant detection was based on measured volume, SSI instead hopes to mislead by referencing separate fluid level measurements.[5] The only evidence of record is that these level measurements form no part of the DZEM Sensor's contaminant detection feature. (Appx647, ¶ 62; Appx648-49, ¶ 67; Appx662, ¶ 111, compare with Appx208, ¶ 57.) SSI's attempted misdirection of this Court is nothing more than a rehash of its previous efforts to mislead the District Court through its argument that the ability to measure a decrease in volume need only take place at the same time, e.g., "while,"

---

[5]  As discussed, the DZEM Sensor uses a Reed switch to determine fluid level. SSI has apparently equated measuring fluid <u>level</u> with measuring fluid <u>volume</u>. Volume, which is measured in cubic centimeters or ounces, is not the same as level, which is measured linearly.

contaminants are detected based on time of flight and temperature.

Under SSI's tortured and incorrect reading of the claim as requiring only that fluid volume is measured at the same time that contaminant detection happens, the rejection in view of Marcovecchio would not have been overcome. As the patent examiner recognized, Marcovecchio "uses a single transduce[r] to monitor the level of fluid and the fluid's composition." (Appx1085.) As such, if all that was required by the claim was the ability to measure a decrease in fluid level while other readings are taken, then SSI's purported distinction over Marcovecchio would be illusory, because Marcovecchio disclosed performing both contaminant detection and measuring fluid level at the same time. Of course, the claim is not as SSI now suggests. Rather, the claim requires that the controller determine the presence of contaminants "based on" whether dilution is detected while the measured volume decreases, not merely that measured volume may decrease while dilution is occurring.

SSI's complete lack of evidence to prove infringement is further highlighted by the fact that SSI failed to point to any computer code regarding contaminant detection in the DZEM sensor. The claim recites "a controller configured to" perform certain tasks. As such, there must be programming to cause the controller to perform the tasks. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir.

2015). Indeed, Van Der Weide, identifies a "Microchip microcontroller" as the controller for the DZEM Sensor. (Appx202, ¶ 46.) Yet, Van Der Weide fails to point to any specific computer code for the DZEM Sensor where the code includes instructions to determine the presence of a contaminant in the fluid using fluid temperature, ToF, **and** dilution being detected while a measured fluid volume decreases. (Appx203-09.) Instead, Van Der Weide aides SSI in its misdirection by merely referencing computer filenames indicating that the DZEM Sensor has a contaminant detection feature, while ignoring the programming for that feature. (*Id*.) Like SSI, Van Der Weide fails to adhere to the actual claim language and offers the irrelevant statement that "the DZEM Sensor determines a dilution (i.e., contaminant) **<u>while</u>** the system and engine are on. When the system and engine are on, the measured volume of the DEF is decreasing because it is being [sic] the DEF is being consumed to breakdown NOx emissions." (Appx208, ¶ 57.)

Notably, the only evidence of computer code analysis was by DZEM's expert, Ganssle, who analyzed the computer code for the DZEM Sensor controller. (Appx647, ¶ 62; Appx648-49, ¶ 67; Appx662, ¶ 111.) Ganssle found the DZEM Sensor computer code indicates fluid concentration is calculated based only on the ultrasound velocity (and calculated ToF) and fluid temperature. (*Id.*) Such a determination is exactly the prior art method of Marcovecchio that caused SSI to add

29

the requirement that the controller be configured to determine presence of contaminants based on "a) whether a **measured volume** is out of range"; and "b) a dilution of the fluid is detected while the **measured volume** of the fluid decreases." The District Court was correct to grant summary judgment of noninfringement in favor of DZEM in view of SSI's failure to provide any evidence of this limitation.

## II.    THE DISTRICT COURT PROPERLY FOUND NO TRIABLE ISSUE AS TO WHETHER DZEM INFRINGED THE ASSERTED CLAIMS OF THE '038 PATENT

The District Court correctly construed the term "filter" found in all of the asserted '038 Patent claims as "a porous structure defining openings, and configured to remove impurities larger than said openings from a liquid or gas passing through the structure." Based on this claim construction, the District Court then correctly determined the DZEM Sensor lacked the claimed "filter," and there could be no infringement of the '038 Patent as a matter of law.

### A.    The District Court Correctly Construed "Filter"

Claim construction is a matter of law for the court. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 390-91 (1996). The court gives claim terms their "ordinary and customary meaning," i.e., "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005). This meaning is determined in light

of the intrinsic evidence, i.e., the claims, the specification, and the prosecution history. *Id.* at 1313-17.

Claim construction begins with the claims themselves since they "define the invention to which the patentee is entitled the right to exclude." *Id*. at 1312. "The claims, of course, do not stand alone." *Id.* at 1315. "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id*. "[T]he specification is always highly relevant to the claim construction analysis," and usually "is the single best guide to the meaning of a disputed term." *Id*. (*quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quotation omitted). "[E]ven though 'claims must be read in light of the specification of which they are a part, it is improper to read limitations from the written description into a claim.'" *Bradium Tech. LLC v. Iancu*, 923 F.3d 1032, 1049 (Fed. Cir. 2019). At the same time, "claims cannot be of broader scope than the invention that is set forth in the specification." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006); *see also Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) ("where the specification makes clear at various points that the claimed

31

invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims."). Also, "prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence." *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (citations omitted).

The prosecution history, which evidences the negotiation between the PTO and the applicant, also "provides evidence of how the PTO and the inventor understood the patent" and "can often inform the meaning of the claim language by demonstrating . . . the inventor limited the invention in the course of prosecution." *Phillips*, 415 F.3d at 1317.

Finally, the court can rely on extrinsic evidence such as expert testimony, dictionaries, and learned treatises in construing a patent's claims. *Id.* (citation omitted). Extrinsic evidence "can shed useful light on the relevant art" but is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* (citations omitted). The court must discount expert testimony clearly at odds with the construction mandated by the claims themselves, the written description, and the prosecution history. *Id.* at 1318. "When prior art that sheds light on the meaning of a term is cited by the patentee, it can have particular value as a guide to the proper construction of the term, because it may indicate not only the meaning of the term to persons skilled in the art, but also that the patentee intended

32

to adopt that meaning." *Arthur A. Collins, Inc. v. N. Telecom Ltd.*, 216 F.3d 1042, 1045 (Fed. Cir. 2000).

Claim 9 is the only asserted independent claim from the '038 Patent and recites:

> A sensor operable to sense a characteristic of a fluid, the sensor comprising:
>
> a sensing area configured to contain the fluid;
>
> a chimney configured to exhaust entrapped air from the sensing area; and
>
> a filter covering the sensing area, the filter configured to allow a liquid portion of the fluid to enter the sensing area, and substantially prohibit one or more gas bubbles of the fluid from entering the sensing area; and
>
> a transducer configured to output a pulse of sound through the liquid portion of the fluid contained within the sensing area, receive the reflected pulse of sound, and
>
> output a characteristic of the fluid based on the received pulse of sound.

(Appx80.)

The District Court correctly construed "filter" as "a porous structure defining openings, and configured to remove impurities larger than said openings from a liquid or gas passing through the structure," because it is fully aligned with the ordinary meaning of "filter" and the teachings in the patent. Moreover, the District Court's construction, unlike SSI's, does not tread on the prior art cited by SSI during prosecution of the patent.

Claim 9 is an apparatus claim, and as such, it "cover[s] what a device is, not what a device does." *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990). Therefore, the claim as construed must inform as to what the structure is. The claim recites that the "filter" covers the sensing area and is configured "to allow a liquid portion of the fluid to enter the sensing area, and substantially prohibit one or more gas bubbles of the fluid from entering the sensing area." This functional language does not explain the structure of the claimed "filter."

"Filter" is an everyday word, e.g., coffee filters and air filters. DZEM's proposed definition adopted by the District Court – "a porous structure defining openings, and configured to remove impurities larger than said openings from a liquid or gas passing through the structure" – is fully consistent with the plain and ordinary meaning of the work. (*See e.g.*, Appx2009-33). SSI does not contend otherwise.

The District Court's claim construction also fully aligns with the teachings in the specification. The '038 Patent describes the claimed "filter" throughout the specification as a porous structure that has openings that are smaller than the bubbles it is keeping out of the sensing area. As such, the '038 Patent specification acts, at the very least, as a dictionary because "it defines terms by implication." *Vitronics*,

34

90 F.3d at 1582. In each disclosed embodiment, this porous structure is specified as

a mesh.

> The fluid sensor includes a sensing area … and a mesh positioned around the sensing area. The mesh is configured to allow a liquid portion of the fluid to enter and exit the sensing area, and substantially prohibit a gas portion of the fluid to enter the channel while providing an exit, or exhaust, for trapped gas to escape.

> FIG. 5 illustrates a filter, or filter shroud, 250 for prohibiting, or inhibiting, the flow of gas, such as but not limited to, gas bubbles (i.e., gas trapped in a liquid). In some embodiments, the filter 250 includes mesh, or one or more mesh screens, 255 and a frame 260. In other embodiments, the filter 250 includes only the mesh screens 255. In some embodiments, the mesh screens 255 are a fine mesh material. In some embodiments, the mesh screens 255 are a synthetic polymer (e.g., nylon, polyethylene, polypropylene, etc.). In other embodiments, the mesh screens 255 are a metallic material.



FIGS. 7-10 illustrate another embodiment of the filter 250′. The filter 250′ includes one or more mesh screens 255, the frame 260, and the arms 265.



FIG. 9

FIG. 11 illustrates another embodiment of a sensor system 130′. In the illustrated embodiment, the sensor system 130′ includes one or more mesh screens 255′. The mesh screens 255′ enclose the sensing areas (e.g., the measurement channel 205, the level sensing tube 220, etc.). In such an embodiment, the filter 250 includes only the mesh screens 255′. In the illustrated embodiment, the mesh screens 255′ are integrated (i.e., molded) into a housing of the sensor system 130′. FIG. 12 illustrates another embodiment of a sensor system 130″. In the illustrated embodiment, the sensor system 130″ includes one or more mesh screens 255″ enclosing the sensing areas (e.g., the measurement channel 205, the level sensing tube 220, etc.) and a chimney 270″. In the illustrated embodiment, the mesh screens 255″ and chimney 270″ are integrated (i.e., molded) into a housing of the sensor system 130″.



FIG. 11     FIG. 12

(Appx72; Appx74; Appx78, Col. 2:55-60; Appx79-80, Col. 4:49-5:17, Col. 5:56-64.) No type of structure, other than a mesh, that could serve as a "filter" is disclosed or even hinted at. As such, DZEM's construction fully aligns with the only teaching of the "filter," and the claims were properly construed by the District Court in this manner. *See On Demand*, 442 F.3d at 1340 ("claims cannot be of broader scope than the invention that is set forth in the specification"); *see also Alloc*, 342 F.3d at 1370 ("where the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper

to limit the claims.").

Not surprisingly, SSI argues that the District Court's construction improperly reads a preferred embodiment from the specification into the claim. That is incorrect on its face. As stated, the only disclosed embodiment, preferred or otherwise, of the filter is a "mesh." Yet, DZEM did not propose limiting the "filter" to a mesh, nor did the District Court limit the claimed filter to a mesh. A "mesh" is a particular type of structure, namely, a material made of a network or wire or thread or an interlaced structure. *See, e.g.*, https://www.collinsdictionary.com/us/dictionary/english/mesh. The District Court did not limit the claims to the preferred embodiment of a mesh, even though it was the only disclosed embodiment. Instead, the District Court held that the construction – "a porous structure defining openings, and configured to remove impurities larger than said openings from a liquid or gas passing through the structure" – was "broad enough to encompass any structure that would be reasonably considered a filter as that term would be understood by one of skill in the art." (Appx13.)

While there is a fine line between construing the claims in light of the specification and improperly importing a limitation from the specification into the claims, *Phillips*, 415 F.3d at 1323, where, as here, the specification expressly states each embodiment contains a feature and does not disclose alternative embodiments,

limiting the claims to what is disclosed in the specification does not amount to the improper importation of a limitation from the specification into the claims. *See Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011). In this case, because "filter" is defined by implication, the District Court's construction is correct. *See Vitronics*, 90 F.3d at 1582.

The District Court's claim construction is further fully in line with the specification's teaching of how the filter works to keep gas bubbles out of the sensing area.

> "[T]he corollary to a particle is a gas bubble trapped within the fluid. The mesh screens 255 act to prevent the gas bubbles from entering into a sensing area (e.g., the measurement channel 205, the level sensing tube 220, etc.), while allowing liquid, or a liquid portion to enter the sensing area or sensing areas. In one embodiment, gas bubbles within the fluid having a size larger than an aperture size of the mesh screens 255 are unable to freely pass through the mesh screens 255. However, a liquid portion of the fluid, can freely pass through the mesh screens 255, as well as gas bubbles which have a diameter smaller than the aperture size of the mesh screens 255. It has been found through empirical testing of a DEF tank system that an aperture size of 100 microns reduces the quantity of gas bubbles within a sensing area sufficiently enough to enable continuous measurements by the concentration sensor 170 and/or the level sensor 175."

(Appx80, Col. 5:1-17.)

SSI takes issue with the District Court's reliance on this teaching, arguing that the claim does not recite tiny holes. SSI's argument begs the relevant question, namely, what is the correct meaning of "filter" in view of the intrinsic evidence? SSI

38

fails to point to, because it cannot, any intrinsic evidence that is inconsistent with the District Court's claim construction. "Of course, 'the claims cannot be of broader scope than the invention that is set forth in the specification.'" *Gemalto SA v. HTC Corp.*, 754 F.3d 1364, 1369 (Fed. Cir. 2014) (*quoting On Demand*, 442 F.3d at 1340). Yet, that is exactly what SSI's rejected claim construction does.

The prior art cited in the prosecution history of the '038 Patent further demonstrates that "filter" in the relevant art is understood to be a structure according to DZEM's construction. These include U.S. Patent Nos. 7,118,206 and 7,270,690. Each of these prior art patents disclose "filters," which are described as porous media that blocks undesirable material from passing therethrough by virtue of the relative size of the apertures in the media. In U.S. Patent No. 7,118,206, the "filter" is described as a porous mesh. (Appx2047, Col. 9:23-39, Col. 10:12-24.) In U.S. Patent No. 7,270,690, the specification describes a combination of filters having certain porosity, and a vane arrangement. The vane arrangement blocks certain particulates disrupting flow, and the "filter" blocks other particulates by way of the relative size of the apertures. (Appx2063, Col. 7:27-8:21.)

Moreover, the prosecution history includes other prior art cited by SSI that further demonstrates the flaw with SSI's proposed construction. SSI contends that "filter" should be defined as "a device containing openings through which liquid is

passed that blocks and separates out matter, such as air bubbles." Prior art cited by SSI during prosecution of the '038 patent, however, discloses precisely such a structure. During prosecution, SSI identified Niemann in an information disclosure statement as prior art. (Appx1401.) Niemann taught a sensor to measure fluid level. (Appx286, ¶ 62; Appx321; Appx2096, ¶¶ 0002 and 0008.) In order to prevent the problem with bubbles in a sensing area, Niemann further taught a device to cover the sensing area, which included openings through which liquid is passed, and which kept bubbles from entering the sensing area. (Appx286, ¶ 62; Appx324; Appx2096-98, ¶¶ 0009-0010, 0038-0039.) The District Court appropriately stated that a "fundamental problem with SSI's proposed construction is that it would include devices that are not filters, such as a centrifuge or a set of baffles, so long as the device removes matter from a liquid."[6] (Appx14.) Niemann is an example of such a device that SSI's overbroad construction would cover. Indeed, SSI's own expert,

---

[6] SSI devotes substantial discussion to the District Court's disparagement of SSI's proposed construction for "filter." Obviously, DZEM agrees with the numerous problems with SSI's proposed construction. However, the relevant question is whether the District Court erred with its proposed construction. SSI's arguments fail to demonstrate any error in the District Court's claim construction.

Strzelec, states that the "stillwell" of Niemann is not a "filter." (Appx501-02, ¶¶ 49-50.)[7]

The prosecution history further demonstrates that both the PTO and SSI understood "filter" to have a meaning that is fully aligned with the District Court's construction. SSI presented originally-filed claim 1 reciting the filter as:

> a filter covering the sensing area, **the filter configured to** allow a liquid portion of the fluid to enter the sensing area, and **substantially prohibit a gas** <u>portion</u> of the fluid from entering the sensing area…

(Appx1447.)

The examiner rejected this as non-enabled and explained that "[i]t is not clear how the filter can prohibit all gas from passing through the filter, while still allowing the liquid to pass through. Again, **this would only appear to work where gas bubbles are larger than the holes in the filter**, but all other gases within the liquid would pass through the holes." (Appx1385-86 (emphasis supplied)). At no time did SSI argue that a "filter" could be **any structure** that performed the recited function. (Appx1374-75.) Of course, because of the prior art Niemann reference, of which SSI was aware, it could not. Instead, SSI accepted the examiner's view that a filter was a structure with numerous small openings that prevented bubbles larger than the

---

[7] DZEM's expert, Ganssle, also premises his opinion that Niemann anticipates claim 9 on SSI's proposed claim construction, as opposed to DZEM's construction adopted by the District Court. (Appx286, ¶ 62.)

41

openings from passing through the structure, which is fully in line with the District Court's construction. Where an examiner espouses a meaning for a claim term and the applicant does not object, this constitutes a disavowal of other meanings. *See Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 979 (Fed. Cir. 1999). "To be sure, failure to object to an examiner's interpretation of a claim ordinarily disclaims a broader interpretation." *Inverness Medical Switzerland GmbH v. Warner Lambert Co.*, 309 F.3d 1373, 1380 (Fed. Cir. 2002).

The extrinsic evidence, including engineering and general purpose dictionaries, similarly confirms the District Court's construction of "filter" to be correct. *See Dictionary of Mechanical Engineering*, G.H.F. Nayler ("A restrictive portion in a fluid flow system designed to remove solid particles. It may be a fine gauze as used in petrol and paraffin supply lines or paper as for car engine air inlets. There are no restrictions on the materials that may be used"); *Dictionary of Mechanical Engineering* by Oxford University Press ("[a] mesh, gauze, paper, or cloth, usually held by a frame, that removes particulates larger in diameter than the mesh or pore size from a fluid stream passing through it"); *Collins Dictionary* ("A filter is a device through which a substance is passed when it is being filtered... a paper coffee filter. Synonyms: sieve, mesh, gauze, strainer"); *Merriam-Webster* ("a porous article or mass (as of paper or sand) through which a gas or liquid is passed

42

to separate out matter in suspension"); *The American Heritage Dictionary* ("A porous material through which a liquid or gas is passed in order to separate the fluid from suspended particulate matter.") (*See* Appx2009-33.) Other extrinsic evidence in the form of expert testimony also supports the District Court's claim construction. (Appx632-38.)[8]

All of the evidence, intrinsic and extrinsic, demonstrates that the District Court correctly construed "filter" as "a porous structure defining openings, and configured to remove impurities larger than said openings from a liquid or gas passing through the structure." This Court should affirm.

### B.    The District Court Correctly Found That The DZEM Sensor Does Not Include The Claimed "Filter"

As the District Court correctly held, the rubber cover in the DZEM Sensor cannot meet the filter limitation as construed by that court. As such, SSI cannot prove that the DZEM Sensor includes all of the claimed limitation, and the District Court was correct to grant summary judgment of noninfringement of the '038 Patent.

The DZEM Sensor includes a rubber cover that goes around the sensing area. This rubber cover is shown below (with annotations showing inlet holes).

---

[8] It is further worth noting that SSI itself understood the difference between a "filter," and a general device containing openings through which liquid is passed that blocks and separates out matter, such as air bubbles. *See* U.S. Pat. No. 10,012,121 describing such a structure as a "shroud." (Appx2065.)



In addition to these holes, the rubber cover includes additional openings.



This rubber cover is not the claimed filter, namely, "a porous structure defining openings, and configured to remove impurities larger than said openings from a liquid or gas passing through the structure." A porous structure is one having numerous minute spaces or holes through which liquid or air may pass. *See e.g.,*

44

https://www.collinsdictionary.com/us/dictionary/english/porous;

https://www.merriam-webster.com/dictionary/pore. The rubber cover is not a

porous structure. The rubber cover does not include pores, i.e., minute through-

passages.[9]

Instead, the openings in the rubber cover are approximately 6 x 2 mm, with

an area of 12 mm$^2$. (Appx661-62, ¶ 110.) The holes in the patent that were

experimentally determined to offer filtration are 100 microns in diameter, which is

an area of 0.0078 mm$^2$. (*Id.*) That is over 1,000 times larger in size than the holes

that the '038 Patent says were determined to offer sufficient filtration. The holes in

DZEM sensor's rubber cover do not perform the function of a filter. (*Id.*)

As the District Court recognized, SSI's expert, Strzelec, performed

experiments on the rubber cover wherein she submerged the DZEM Sensor in fluid,

and then used an aerator to generate bubbles in the tank. (Appx15-16.) In some

experiments, she used the aerator to generate large bubbles, and in others, small

bubbles. (*Id.*) Strzelec admits that "most of the air bubbles were deflected by the

portions of [the rubber cover] where there are no openings." (*Id.*) In addition,

---

[9]  By the same token, a tub with a drain hole would not be considered a porous
structure.

"[s]maller air bubbles that got through the openings exited slits on the sides of the filter membrane." (*Id.*) This is shown below:



The rubber cover in the DZEM Sensor deflects bubbles away from the sensing area along a tortuous path. (Appx661-62, ¶ 110.) The bubbles are not blocked; they simply flow upwards from the bottom holes in the rubber cover to the outlets above. (*Id.*) The rubber cover is a diverter, not a filter. (*Id.*)

In fact, the rubber cover does not effectively prohibit bubbles from entering the sensing area. This conclusion is evident from the fact that the DZEM Sensor includes several solutions for bubbles in the sensing area. (Appx662, ¶ 111.) First, the sensing area's reflector is specially treated to repel bubbles. (*Id.*) In addition, the DZEM Sensor includes software devoted to detecting bubbles and rejecting velocity readings that are corrupted by bubbles. (*Id.*) As such, the rubber cover of the DZEM Sensor does not meet the filter limitation because it does not substantially prohibit

46

bubbles from entering the sensing area based on the relative size of openings versus the size of bubbles.

SSI argues that, under its rejected claim construction, the DZEM Sensor infringes. First, the District Court has not rendered any opinion on this issue to be reviewed, and it is not properly before this Court and should be stricken. *See Proveris Scientific Corp. v. Innovasystems, Inc.*, 739 F.3d 1367, 1373 (Fed. Cir. 2014) (Insufficient findings preclude meaning review by Appellate Court). Furthermore, even under SSI's rejected claim construction, there is no disputed issue of material fact that there is no infringement. The claim does not merely state that the claimed "filter" block and separates out **some bubbles**. Instead, the claim expressly states that the filter must "substantially prohibit one or more gas bubbles from entering the sensing area." As discussed, the DZEM Sensor's rubber cover does not substantially prohibit bubbles. Instead, a substantial number of bubbles enter the sensing area, and are accounted for through surface treatments and processing by DZEM's software. Accordingly, the District Court correctly granted DZEM summary judgment of no literal infringement of the '038 patent.

Utterly lacking evidence to support its literal infringement case, SSI strains to argue there is a genuine issue of fact as to whether the DZEM Sensor meets the "filter" limitation under the doctrine of equivalents. As an initial matter, the District

Court correctly held that "SSI doesn't develop this argument, so it is forfeited." (Appx17.) SSI's doctrine of equivalents arguments, even if not forfeited, are estopped. Lastly, if not forfeited or estopped, SSI's doctrine of equivalents arguments raise no genuine issue of material fact to preclude summary judgment.

With regard to SSI's forfeiture, SSI's arguments on the doctrine of equivalents that were presented to the District Court amount to little more than a recitation of the relevant function-way-result law, and conclusory statements that the DZEM Sensor had the same function, way, and result. As a matter of law, boilerplate and conclusory assertions of equivalence are insufficient. *See Network Commerce v. Microsoft*, 422 F.3d 1353, 1363 (Fed. Cir. 2005) ("The expert declaration and other evidence relied on by Network Commerce supporting infringement by equivalents are generalized and do not provide particularized testimony and linking argument on a limitation-by-limitation basis. For this reason the evidence did not raise a genuine issue of material fact. Summary judgment of noninfringement under the doctrine of equivalents regarding metafiles was therefore proper.").

SSI's doctrine of equivalents arguments are also subject to prosecution history estoppel. If a patentee surrenders certain subject matter during prosecution, the patentee is then barred from using the doctrine of equivalents to recover for infringement based on that same subject matter. *Festo Corp. v. Shoketsu Kinzoku*

48

*Kogyo Kabushiki Co.*, 535 U.S. 722, 733-34 (2002). Prosecution history estoppel can occur either when the patentee makes a narrowing amendment to the claim or surrenders claim scope through argument to the patent examiner. SSI originally claimed "a filter covering the sensing area, the filter configured to allow a liquid portion of the fluid to enter the sensing area, and substantially prohibit a gas portion of the fluid from entering the sensing area." (Appx1447.) The examiner rejected originally-filed claim 1 as non-enabled and stated:

> It is not clear how the filter can prohibit all gas from passing through the filter, while still allowing the liquid to pass through. Again, this would only appear to work where gas bubbles are larger than the holes in the filter, but all other gases within the liquid would pass through the holes.

(Appx1385-86.) SSI amended its "filter" limitation to require that the filter "substantially prohibit gas bubbles from of the fluid from entering the sensing area." (Appx1371-72.) As discussed with regard to claim construction, SSI's claim amendment and acceptance of the patent examiner's understanding of the meaning of the "filter" as claimed demonstrates disclaimer. As such, SSI's doctrine of equivalents contentions are estopped. "Ultimately, the doctrine of prosecution disclaimer ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers." *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1381 (Fed. Cir. 2021) (*quoting Aylus Networks, Inc. v.*

*Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017)). Moreover, SSI's amendment makes clear that the "filter" strains out bubbles from the liquid entering the sensing area based on the relative size of the bubbles and the holes in the filter, which is in sharp contrast to how the rubber cover diverts bubbles. "Subject matter surrendered to acquire the patent cannot be recaptured by the doctrine of equivalents." *Ottah v. Fiat Chrysler*, 884 F.3d 1135, 1140 (Fed. Cir. 2018) (*citing Duramed Pharm., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011)).

Even if SSI's doctrine of equivalents arguments were not forfeited and estopped, the "filter" limitation is also not met by the DZEM Sensor's rubber cover under the doctrine of equivalents. As discussed, the way in which it reduces bubbles in the sensing area is substantially different from way in which the claimed filter works. Also, the result of the rubber cover is substantially different. The rubber cover does not substantially eliminate bubbles entering the sensing area. Even SSI's expert, Strzelec, admits that the DZEM Sensor rubber cover only "reduces the amount of bubbles in the sensing area." (Appx158-59, ¶ 86.) The claim and patent specification make clear, however, that a mere reduction of bubbles is not the purpose of the filter. Instead, as discussed above, bubbles must be substantially prohibited from entering the sensing area. This is because any bubbles in the sensing area will negatively affect the ultrasound pulse and readings based thereon. The DZEM Sensor rubber

50

cover does not provide such a result or any substantially similar result. As discussed, it was undisputed that a substantial number of bubbles that enter the sensing area are addressed through a software solution, as opposed to the filter.

Lastly, to the extent that the rubber cover could be considered an equivalent of a filter, it would read on the prior art, including prior art cited by SSI. "A doctrine of equivalents theory cannot be asserted if it will encompass or ensnare the prior art." *Jang v. Boston Scientific Corp.*, 872 F.3d 1275, 1285 (Fed. Cir. 2017). As discussed, SSI identified in an information disclosure statement submitted to the patent office the Niemann reference, which discloses an ultrasonic sensor operable to sense a fluid level. (Appx1401.) The Niemann sensor sensing area is covered by a device called a "stillwell" that includes openings through which liquid is passed, and that keeps bubbles from entering the sensing area. (Appx286, ¶ 62; Appx324; Appx2096-98, ¶¶ 0009-0010, 0038-0039.) As such, the doctrine of equivalents does not warrant reversal of the District Court's findings of noninfringement.

## III.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT TO SSI ON DZEM'S TORTIOUS INTERFERENCE COUNTERCLAIM

Under Wisconsin law, interference with a prospective contractual relationship requires proof that "(1) the plaintiff had a… prospective contractual relationship with a third party; (2) the defendant interfered with the relationship; (3) the interference

39621689.1

was intentional; (4) a causal connection exists between the interference and the damages; and (5) the defendant was not justified or privileged to interfere." *Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.3d 781, 798 (Wis. 2006).

The District Court granted summary judgment in favor of SSI on DZEM's tortious interference counterclaim for two reasons: first, it found the claim was barred by the *Noerr-Pennington* doctrine; and second, it held that DZEM's evidence was insufficient to demonstrate "a sufficiently certain, concrete and definite prospective relationship between DZEM and a third party." (Appx18-21 (*citing E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961))). Both findings were in error and this Court should reverse.

## A.    DZEM's Tortious Interference Claim is Not Barred by *Noerr-Pennington*

"Under *Noerr-Pennington*, a person's act of petitioning the government is presumptively shielded from liability by the First Amendment against certain types of claims." *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1349 (Fed. Cir. 2014). In this case, SSI was not entitled to *Noerr-Pennington* immunity for two reasons; ***first***, SSI's threatening letters to third parties – many of whom were outside the jurisdiction of SSI's patent protection – were not aimed at procuring government action, and, ***second***, even if they were, the "sham" litigation exception to the doctrine applies.

### 1.    SSI's Threatening Letters are Not Protected

The *Noerr-Pennington* doctrine only protects individuals who "use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972). It does not protect SSI's use of this litigation as an anticompetitive weapon. *See Rodime PLC v. Seagate Technology, Inc.*, 174 F.3d 1294, 1307 (Fed. Cir. 1999). Here, SSI's actions were not taken in an effort to petition the government. Instead, those actions were aimed solely at disrupting DZEM's market share. As a result, they should not receive *Noerr-Pennington* protection.

First, SSI's letters to third parties are not protected because they are not aimed at obtaining relief from a governmental entity. For this reason, several courts have found that letters to third parties are not protected by *Noerr-Pennington*. *See, e.g.*, *Golden Eye Media USA, Inc. v. Trolley Bags UK, Ltd.*, 525 F. Supp. 3d 1145, 1239-40 (2021) ("Defendants are correct that under the *Noerr-Pennington* doctrine, courts consider 'cease and desist letters and threats of litigation' as 'pre-litigation material… immune from suit… However, where those letters are sent to third-parties, rather than the ultimate parties in a subsequent suit, they are not protected."); *Inline Packaging, LLC v. Graphic Packaging Int'l, Inc.*, 164 F. Supp. 3d 1117, 1132 (D.

53

This page contains confidential material - customer name

Minn. 2016) ("[Defendant] has not identified any cases, and this Court has found none, supporting the extension of *Noerr-Pennington* to scenarios where those receiving the communications were third parties not directly threatened with litigation."); *see also Toyo Tire & Rubber Co. v. Atturo Tire Corp.*, No. 14-cv-0206, 2017 WL 1178224, *6 (N.D. Ill. Mar. 30, 2017).

In this matter, SSI's letters were not to DZEM, but were to third parties in a concentrated effort to interfere with DZEM's business. Thus, these letters were not aimed at procuring favorable government action and are not entitled to *Noerr-Pennington* immunity. *Cf Industrial Models, Inc. v. SNF, Inc.*, 716 Fed. Appx. 949, 955 (Fed. Cir. 2017) (affirming dismissal pursuant to *Noerr-Pennington* for actions taken by defendant "attendant upon effective litigation."). In fact, the letters to DZEM's potential customers had *nothing* to do with SSI's suit – those communications were not "attendant upon effective litigation" but instead were designed to tortiously and improperly interfere with DZEM's business relations.

Second, SSI's communications to parties located in jurisdictions where SSI has no patent protection are not subject to *Noerr-Pennington* immunity. Put another way, SSI's communications to the Dutch Company in the Netherlands or custom name in Brazil could not have been aimed at procuring favorable government action because SSI could not obtain such action where it has no rights to do so. Accordingly, for

this additional reason, SSI's letters to DZEM's customers where SSI enjoyed no patent protection were not protected by *Noerr-Pennington*. *See Rodime*, 174 F.3d at 1307 ("Seagate's contacts with Rodime's potential licensees… had nothing to do with petitioning the government.").

At minimum, there were questions of fact that should not have been resolved on summary judgment as to whether SSI's actions were truly aimed at obtaining government action. Because all inferences should have been drawn in favor of DZEM on SSI's Motion, the District Court erred in finding *Noerr-Pennington* to apply on the record before it. This Court should reverse.

## 2. Even if the Letters are Protected, the Sham Litigation Exception Applies

"There is a recognized exception to *Noerr-Pennington* immunity for 'sham litigation.'" *Industrial Models*, 716 Fed. Appx. at 955. *Noerr-Pennington* immunity does not extend to activity that, though "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1375 (Fed. Cir. 2004).

To establish the "sham litigation" exception to the *Noerr-Pennington* doctrine, a plaintiff must demonstrate that the defendant's actions were "objectively baseless"

and that the "defendant subjectively intended to harm the plaintiff through an abuse of governmental process itself." *Content Extraction*, 776 F.3d at 1350. As demonstrated by the District Court's finding of noninfringement, there is little question that SSI's actions in contacting DZEM's customers were "objectively baseless." Moreover, for numerous reasons, the asserted claims of the '038 patent were invalid. (ECF No. 99, pp. 29-39.)

In finding the sham litigation exception not to apply, the District Court relied upon SSI's submission of expert testimony, finding that SSI's expert's opinion was not "plainly unreasonable." (Appx20.) But courts cannot – and should not – rely on expert testimony on questions of law. *See Golden Eye*, 525 F. Supp. 3d at 1202; *see also VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422, 427 n.4 (W.D. Pa. 1998) (noting that "lack of objective baselessness is not the sort of issue that lends itself to expert testimony."). In finding otherwise, the District Court cited this Court's opinion in *800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354 (Fed. Cir. 2008). But, *800 Adept, Inc.* did not consider applicability of *Noerr-Pennington* and instead determined whether the plaintiff's tortious interference claim was preempted by federal law. *Id.* at 1370.

And, there was at least a question of fact regarding SSI's subjective motivation in bringing the lawsuit – SSI went on an extensive campaign to dissuade OEM

56

manufacturers from doing business with DZEM, going so far as to threaten entities in countries where SSI does not have patent protection. *Noerr-Pennington* does not protect these types of tortious actions. *See Cent. Telecommunications, Inc. v. TCI Cablevision, Inc.*, 800 F.2d 711, 722 (8th Cir. 1986) (*Noerr-Pennington* "does not protect threats… or unlawful acts which were not genuine efforts to influence public officials."). Moreover, there is no evidence that SSI relied on its expert's opinions at the time it sent its threat letters. Accordingly, the District Court erred in finding *Noerr-Pennington* to immunize SSI's conduct. This Court should reverse.

### B.     Questions of Fact Otherwise Precluded Entry of Summary Judgment on DZEM's Tortious Interference Claim

Although it appears to have found *Noerr-Pennington* not applicable to SSI's actions with regard to DZEM's customers in countries where SSI has no patent protection, the District Court nonetheless entered summary judgment in favor of SSI on DZEM's tortious interference counterclaim. (Appx20.) That court found that "DZEM failed to adduce evidence that it had prospective contracts with" these companies. (Appx21.) This decision was in error. An individual improperly interferes with a prospective business expectancy by "(a) inducing or otherwise causing a third person not to enter into or continue [a] prospective relation or (b) preventing the other from acquiring or continuing [a] prospective relation." *Foseid v. State Bank of Cross Plains*, 541 N.W.2d 203, 209 (Wis. Ct. App. 1995). DZEM

put forth enough evidence at the summary judgment stage to create a question of fact on its claim.

That evidence demonstrated that SSI knew of DZEM's prospective contracts with OEM manufacturers and purposefully interfered with those contracts by threatening to sue every company that used the DZEM Sensor, regardless of the validity of SSI's claim. (ECF No. 127, Ex. 5.) Internal communications at SSI unequivocally showed that SSI knew the six biggest OEM manufacturers were working with DZEM. (ECF No. 127, Exs. 3-4.) To the extent Wisconsin law requires it (and it does not), these internal communications show a "sufficiently certain, concrete and definite prospective relationship" between DZEM and the third parties. (*See id.*; Appx21.) At the very least, a reasonable jury could conclude as such.

Furthermore, the only caselaw relied upon by the District Court in finding such a "concrete and definite" relationship to be required, is unavailing. In *Shank v. William R. Hague, Inc.*, 192 F.3d 675 (7th Cir. 1999), the Seventh Circuit found that Wisconsin had not extended the tort of interference with a prospective contract to apply to interference with business relationships. According to that court, a plaintiff must demonstrate "sufficient evidence of a prospective *contract*" in order to succeed on such a claim. *Id.* at 685 (emphasis in original). The law in Wisconsin has evolved since *Shank*, with courts finding interference with a prospective business

*relationship* to be sufficient to recover for tortious interference. *See, e.g., Burbank Grease*, 717 N.W. 2d at 797-98; *Rittenhouse v. Hulce*, 827 N.W.2d 929 (Wis. Ct. App. 2013).

The evidence submitted by DZEM was sufficient to overcome summary judgment as it clearly demonstrated potential business relationships with the Dutch Company, █customer name█ , and █customer name█ Brazil, all of whom were located in jurisdictions where SSI had no patent protection. The District Court's decision, therefore, granting summary judgment to SSI was improper and should be reversed.

### C. DZEM's Patent Invalidity Claim Should Not Have Been Dismissed as Moot

The District Court dismissed DZEM's invalidity counterclaim as moot, finding that DZEM did not face "any risk of future prosecution under either of the patents-in-suit." (Appx18.) The District Court should have decided DZEM's patent invalidity claims, as the summary judgment on SSI's infringement claims did not moot the invalidity issue.

The Supreme Court has expressed its preference for courts to resolve the question of a patent's invalidity even where that court determines that the patent has not been infringed. *See Cardinal Chemical Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 100 (1993) ("[O]f the two questions, validity has the greater public importance."). "A counterclaim questioning the validity or enforceability of a patent raises issues

beyond the initial claim for infringement that are not disposed of by a decision of non-infringement." *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1348 (Fed. Cir. 2005); *see also Telecordia Technologies, Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1375 (Fed. Cir. 2010) ("A party seeking a declaratory judgment of invalidity presents a claim independent of the patentee's charge of infringement."); *Fin. Control Sys. Pty, Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1321 (Fed. Cir. 2001) ("[B]ecause [defendant] had raised the alleged invalidity and unenforceability of the '359 patent in its counterclaim, the court was obligated to rule on these matters as a prerequisite to entering judgment in the case."); *SanDisk Corp. v. STMicroelectronics, Inc.*, 480 F.3d 1372, 1380 (Fed. Cir. 2007) (*quoting MedImmune v. Genentech, Inc.*, 549 U.S. 118, 132 (2007)) ("[A]ppellate affirmance of a judgment of noninfringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim of patent invalidity.").

Indeed, this Court has found error in a district court's dismissal of a counterclaim for invalidity upon a finding of noninfringement, *Fort James*, 412 F.3d at 1348, and has further stated:

> It is black letter law that non-infringement does not moot a counterclaim regarding invalidity. "A party seeking a declaratory judgment of invalidity presents a claim independent of the patentee's charge of infringement." Thus, "appellate affirmance of a judgment of noninfringement, eliminating any apprehension of suit, does not moot a declaratory judgment counterclaim of patent invalidity."

*VirnetX Inc. v. Apple Inc.*, 931 F.3d 1363, 1373 (Fed. Cir. 2019).

In dismissing DZEM's invalidity counterclaim, the District Court relied exclusively on this Court's decision in *Flexuspine, Inc. v. Globus Medical, Inc.*, 879 F.3d 1369 (Fed. Cir. 2018). That case, however, did not warrant dismissal under the factual circumstances presented in this case. In *Flexuspine*, the defendant appealed the district court's decision denying its Rule 59(e) motion and denying as moot its Rule 50(b) motion. Plaintiff filed an infringement action against defendant on five patents. *Id.* at 1371. Defendant counterclaimed for invalidity of the patents. The matter went to a jury trial, at which plaintiff submitted a verdict form that included a "stop instruction" on the invalidity issue; in other words, it instructed the jury not to answer the invalidity question if it did not find in favor of plaintiff on infringement. *Id.* at 1372. Defendant failed to properly object to the instruction and the jury returned a verdict of noninfringement. *Id.*

Defendant filed a Rule 59(e) motion requesting that the judgment be amended to include a verdict on invalidity and a Rule 50(b) motion for judgment as a matter of law on invalidity. *Id.* The district court denied the Rule 59(e) motion and dismissed the invalidity claims, thereby denying the Rule 50(b) motion as moot. *Id.* at 1373. The parties appealed. This Court held that the district court did not abuse its discretion in denying defendant's Rule 50(b) motion as moot, stating:

We conclude that the district court was within its discretion to dismiss [defendant's] invalidity counterclaims without prejudice. This court has expressly held that "[a] district court judge faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or dismiss it without prejudice." [Defendant] is correct that a district court is typically faced with a live invalidity counterclaim only after the court grants summary judgment of noninfringement and that its discretion to dismiss invalidity counterclaims at later stages in the proceedings may be more limited. Under the specific circumstances here, however—where the district court clarified that [defendant's] invalidity counterclaims were not submitted to the jury and [defendant] waived its right during the trial to have the jury consider those claims—it was within the district court's discretion to dismiss [defendant's] counterclaims without prejudice.

*Id.* at 1376 (citations omitted).

These unique factual circumstances are not present here: there was no jury verdict or waiver of resolution of the invalidity claims. Moreover, cases that have found dismissal of an invalidity defense to be appropriate involved either invalidity asserted only as an affirmative defense (and not a counterclaim), *see Cardinal Chemical*, 508 U.S. at 94; *Hill-Rom, Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1344 (Fed. Cir. 2000) (distinguishing between invalidity affirmative defense and counterclaim), or detailed factual situations not present in this case where the original plaintiff covenanted not to sue the defendant for patent infringement. *See Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1347-48 (Fed. Cir. 2007) (invalidity counterclaim moot where plaintiff covenanted and promised not to sue defendant for patent infringement).

62

DZEM's invalidity claim asserted that SSI's patents-in-suit were invalid because they were not novel (35 U.S.C. § 102), were obvious (*id.* § 103), and failed to comply with 35 U.S.C. § 112 (specification). (Appx123-26.) These issues were not resolved or mooted by the District Court's judgment of noninfringement and DZEM was entitled to a ruling on them.

As made obvious by this appeal, SSI continues to not only assert the validity of its patents, but also to claim that DZEM is infringing upon them. Further, SSI's actions with regard to its patents – including contacting multiple of DZEM's customers – indicate its intention to continue its attempts to harm DZEM even if the infringement judgment is affirmed. For these reasons, the District Court abused its discretion in dismissing DZEM's invalidity counterclaim as moot. This Court should reverse.

## IV.    CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's summary judgment of no infringement of the asserted claims of the '153 and '038 Patents. The Court should reverse the District Court's summary judgment of no tortious interference, and the dismissal of DZEM's invalidity contentions as moot.

Date: February 7, 2022          Respectfully submitted,

By,   /s/ Joseph M. Kuo
        Joseph M. Kuo
        Elizabeth A. Thompson
        SAUL EWING ARNSTEIN & LEHR LLP
        161 N. Clark Street, Suite 4200
        Chicago, Illinois 60601
        (312) 876-7151
        (312) 876-0288
        joseph.kuo@saul.com
        elizabeth.thompson@saul.com


        *Attorneys for Defendant-Cross-Appellant*
        *Dongguan Zhengyang Electronic*
        *Mechanical LTD*

64

FORM 31. Certificate of Confidential Material

Form 31
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 21-2345 and 22-1039 (consolidated) ⊞

**Short Case Caption:** SSI Technologies, LLC v. Dongguan Zhengyang Electronic Mechanical, Ltd.

---

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).

- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

---

The foregoing document contains ___3___ number of unique words (including numbers) marked confidential.

☑ This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

☐ This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).

☐ This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 02/07/2022

Signature: Joseph M. Kuo

Name: Joseph M. Kuo

Form 19
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS</u>

**Case Number:**  21-2345 and 22-1039 (consolidated)

**Short Case Caption:**  SSI Technologies, LLC v. Dongguan Zhengyang Electronic Mechanical, Ltd.

> **Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑    the filing has been prepared using a proportionally-spaced typeface and includes  14,179  words.

☐    the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐    the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 02/07/2022          Signature:  Joseph M. Kuo

                          Name:  Joseph M. Kuo

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2022, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, and thereby caused it to be served on all counsel of record registered to receive such service.


/s/ Joseph M. Kuo

39621689.1